Thank you, Your Honor. Good morning, and may it please the Court, Hanny Fukui from the Federal Public Defender's Office on behalf of both Mr. Henderson and Mr. Hammond. In terms of how I was planning to allocate my time, Your Honor, my goal was to speak solely as to the search warrant issue, given this Court's decision in Reinhart, which I think adequately addresses the government's cross-appeal of the sentence, unless, of course, the Court has any questions. I also plan to reserve four minutes for rebuttal. One magistrate judge in one federal district issued one search warrant that authorized the search of over 158,000 computers across the United States. The Third and the Eighth Circuits have ruled that the NIT operation amounted to 158,000 violations of Rule 41 in the Fourth Amendment. Because the Department of Justice knew that neither Rule 41 nor the Constitution authorized the sweeping extraterritorial search warrant, the good-faith exception to the exclusionary rule does not apply, and the government shouldn't be allowed to deliberately disregard the important legal limitations in Rule 41 in the Constitution without consequence. And so we would ask this Court to reverse. I'll start by talking about the specific Rule 41 violation at issue here. As the briefs have made very clear, at the time that the NIT warrant was issued, Rule 41b did not allow a magistrate judge to issue a warrant authorizing a search outside of their prescribed district, with some exceptions, none of which apply here. The overwhelming majority of courts looking at this NIT warrant have agreed that the warrant violated Rule 41, and in turn violated the Magistrate's Act, Title 28, U.S. Code 636. And that includes both of the district courts below, as well as the Third and the Eighth Circuits. To address briefly the argument the government raised, which is this NIT warrant was a, quote, tracking warrant, end quote, under Rule 41b-4, again, the Third and the Eighth Circuits have both rejected that argument. And that's because the NIT did not track the movement of person or property, and its explicit purpose, as the Third Circuit held in Werden, was to obtain information from activating computers and not track movement. It might be different under the revised rule. The situation would be different under the revised rule. And we acknowledge that. And I think that's going to be a crucial issue, I think, when it comes to good faith, which I will get there shortly, unless the Court obviously wants to get into it now. But I think it's clear at the time the warrant issued, Rule 41 did not authorize the search, and the majority of courts have held that it was not a tracking warrant. And so under this Court's precedent, under Martinez-Garcia, this Court can suppress if the Rule 41 violation is either constitutional, prejudicial, or the government acts in bad faith. Now, not all three need to be met. The Court can suppress if one of those three is met. Now, it's our position that all three of these scenarios have been met, and any one of these three scenarios would have been grounds to suppress the NIT warrant. The Third and the Eighth Circuits focused on constitutionality, and so I'll start with that. And to clear up one quick point specific to Mr. Henderson's case, in Henderson, the district court there stated that the NIT did not actually do a search under the Fourth Amendment because under the district court's interpretation, there's no reasonable expectation of privacy in an IP address under this Court's decision in Forrester. I think the vast majority of the courts, including the district court in Hammond, have found that the NIT was, in fact, a search because it obtained information from computers directly, rather than seeking information from a third-party service provider. And so because it was a search, obviously the NIT required a search warrant. And as the Third and the Eighth Circuits have said, in this case, this warrant was void ab initio, and effectively no warrant at all. And it was Scalia, of course, we can get to the Leon issue, the good faith reliance, but I don't want to advance your argument, but I — No, that's fine, Your Honor. Are these other issues? Sure. I'm happy to address that because I think that's ultimately, I think, the main dispositive issue in the case, because, again, the Third and the Eighth Circuits looking at this exact warrant have found a constitutional violation of Rule 41. In our view, Leon should not apply. And there are essentially two main reasons why we believe Leon shouldn't apply. The first is Leon does not apply to a warrant that is facially deficient. And in our view, this warrant is facially deficient. How? Well, looking at it from the standpoint of the agent that's going to do the search, where's the deficiency? There are two deficiencies. The first is the underlying Rule 41 violation. That is, the warrant purports to authorize searches in the Eastern District of Virginia when, in effect, as the majority of courts have held, the warrant actually did a search in all the other Federal district courts outside of that district, including, in this case, the Northern District of California. So — Well, is that something that we should hold the agents to examine as a legal matter? The search warrant did indicate, did it not, the targets? The warrant did indicate that the targets were, quote, any activating computer. Right. And so it provided some indication that the search would be expansive beyond the Eastern District of Virginia. However, the warrant itself also stated that the place to be searched was the Eastern District of Virginia, and specifically the government server that had the website hosted on it. This is where the harvesting of the information was done. Am I right? I'm trying to think, unless you had a fair amount of computer sophistication, which perhaps the agents involved did, wouldn't it be sort of natural to think, no, we really are searching what's being collected here on this server without making the conceptual leap to the, no, first the server has to query a computer in California, bring the information back? Well, I would respectfully disagree on the idea that information was being harvested in the Eastern District of Virginia. I think, factually, the information was harvested wherever the activating computer was. So in this specific case, it's the Northern District of California. In other cases, it's other districts. So in Werden, for example — Well, I agree with you on the technology. But going back to the agent who's presumably looking at the warrant, would you make that leap again unless you were fairly sophisticated in matters of computer science? I think, number one, with respect to this specific operation, I think it was a fair leap to make because the whole purpose of the NIT operation was to obtain information from those other computers located throughout the United States. I also think that, again, going to this specific investigation, this is a very different scenario from the typical search warrant you may see for what I shorthand call a street-level crime. So in a typical course, a drug investigation, for example, a DEA officer or local law enforcement would sign out the affidavit and go to the magistrate judge, and perhaps there's a DOJ attorney or an assistant U.S. attorney who's perhaps done a quick cursory review of the search warrant before the law enforcement officer submits it to the magistrate judge. But in this specific case, there's way more DOJ involvement in the actual issuance of the warrant. And there's a couple places specifically where that's made clear. First of all, the face of the search warrant itself, and if you look at the ER-2 in both Henderson and Hammett, it's page 108, paragraph 4. The face of the warrant itself indicates that the search warrant was approved by an assistant U.S. attorney. Now, again, on its face, that one piece of it may look no different than a typical search warrant in any other criminal case. But the critical point and the real distinguishing factor is that in addition to the search warrant, the Department of Justice obtained a Title III wiretap. And a Title III wiretap obviously has far more stringent requirements. It requires the district court to authorize the issuance of the wiretap order. And this is the critical fact here. The Title III wiretap order was signed by an assistant U.S. attorney, and it happens to be the same assistant U.S. attorney who reviewed the search warrant affidavit. The other critical fact, and this is the Fourth Circuit has noted this in McLamb at page 689 of that opinion, that they said specifically that the Department of Justice or, sorry, excuse me, that the FBI consulted attorneys with both the Department of Justice and attorneys within the FBI itself. And I think given the sophistication of this investigation, this is not a scenario again to kind of contrast it with a drug crime, for example, where an officer makes an arrest and then swears out a search warrant and a U.S. attorney is doing a cursory review of it. This is a far more involved process involving U.S. attorneys applying for a Title III order, obviously requires planning to set the website up on a government-controlled server, implant the NIT on the site, collect the information, sort out how that information is being harvested or collected from those computers in other districts. And so in our view, law enforcement in this investigation should absolutely have been aware, number one, that the information was being collected from across the country. And number two ---- Kennedy, were you able to get any discovery or some evidence from the agents themselves? And did you ask them? Did you know that you were going beyond Virginia and you were going to Northern California? Well, in this specific case, there was no evidentiary hearing on this point. And I think that would be a separate basis to remand if the Court's inclined to consider good faith. Did you ask for an evidentiary hearing in this case? In Hammond, we did. In Henderson, I was not the attorney of record in the district court for Mr. Henderson. And what was the ruling on it? What was the proffer? Why you wanted an evidentiary hearing? What was the ruling of the district court judge in that regard? So it's a little confusing. In Henderson, the district court made no ---- did no evidentiary hearing, but did apply Leon. In Hammond, there was a request made for an evidentiary hearing, and the district court did not grant an evidentiary hearing, nor did the district court in Hammond actually rule on good faith. Instead, the district court in Hammond determined that the rule 41 violation was not constitutional and there was no prejudice, and so didn't even address that point. So if the court is, and I think understandably this is how all of these cases in the circuit courts have come down on, have essentially been resolved on the Leon issue, at least in these specific cases, there should be more fact-finding to determine what exactly was known by the Department of Justice officials who actually had involvement in this specific operation. On that, are you assigning blame to the lawyers in the Department of Justice who approved the application or to the agents who executed? Both, Your Honor. And it's both. And I think, again, this is a pretty unique set of facts, and I understand there's court precedent that says we don't impute the same level of legal knowledge and sophistication to agents, but I think in this specific set of circumstances where there's actually more involvement by attorneys in the Department of Justice in terms of how this operation was going to play out, that there should have been a better level of understanding of what the limitations are. And I think that to go back to what we started with Judge O'Scanlan's question about the rule change, I think the fact of the rule change also adds to the bad faith here, and that is that because this is going on in the context of a proposal by the Department of Justice to change the rules, that's an additional red flag that should have sent warning signals to the DOJ attorneys at a minimum, but likely to the FBI as well. But we're concerned about the bad faith of the agent. There's no indication in the record about, in any of these, either of these cases, that the agent had special knowledge which he refused to follow? We don't have that. That's true. We don't have that. But I do think more generally we have an understanding. No, I understand. An awareness within the Department of Justice that before this sort of search could be conducted, there are — well, let me say it this way, actually. The DOJ's own manual on searches and seizures indicates that when data is stored in two separate districts, the best practice is to get two warrants from each individual district. And there had been, at the time of the NIT operation, at least some court opinions, not an overwhelming majority, but several court opinions indicating that these kinds of warrants have Rule 41 problems. And that's actually what prompted the Department of Justice to seek the rule amendment to begin with. So when the Department of Justice is engaging in this kind of search in that environment where there's been already some judicial scrutiny of these sorts of requests and there's a proposal to change the rule to allow them to do this, in our view, the prudent course would be to hang tight until the warrant was or the rule was changed. Kennedy. Perhaps the Department of Justice is relying on the fact that the First, the Third, the Fourth, the Eighth and the Tenth Circuits have all upheld on Leon grounds the application of these warrants. Well, those were — all those circuit precedents are looking at this specific NIT warrant. And so those were — that precedent wasn't available to the Department of Justice at the time that these searches took place. I would add that, again, in our view, this is not a scenario where the law was ambiguous. The overwhelming majority of Federal courts looking at this NIT warrant have found it violated Rule 41. This was not a situation where they weren't put on notice before they deployed the NIT that there were potential legal issues and a need to change the rule. Well, you allude to the fact that there was precedent. If I were looking around at the inception of this warrant, I'm now the attorney, what should I have noticed? What was the most convincing decision that would have told me that this is the wrong way to proceed? Well, I think there would be two things. There would, number one, be the magistrate judge's opinion in the Southern District, Texas case. It's — in our brief, it's NRA's search warrant, which explicitly rejected a similar kind of NIT warrant on exactly the same basis. The second is the Tenth Circuit's opinion in Kruger had not been decided at the time of the operation, but the district court opinion in Kruger had been decided and essentially found that a warrant issued in one district but executed in another district was null and void under Rule 41. And then, again, there is the DOJ manual. Now, I know the DOJ manual is not precedent in the same way a court case is, but it does provide some insight into what the permissible legal boundaries are. I'd like to save the rest of my time for rebuttal, if possible. Thank you. You may proceed. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. John Taddy for the United States. In our briefs, we've raised three independent reasons why the evidence derived from the NIT warrant should not be suppressed. First, the NIT qualified as a tracking device under Federal Rule of Criminal Procedure 41b-4. Second, even if the NIT did not qualify as a tracking device, the Rule 41b violation was technical and did not prejudice the defendants. Third, and most clearly, FBI agents applied for and secured the NIT warrant in good faith. I'll start by addressing the tracking device issue, but I'd like to spend a few minutes on that. You really don't have much of an argument on the tracking device unless you can retroactively apply the amended version of Rule 41, can you? Well, I disagree, Your Honor. Eighteen district court opinions have held that this warrant complied with Rule 41b-4 as a tracking device. Now, that is the minority of district court decisions that have addressed this particular NIT warrant, but those decisions, in the government's view, did correctly apply Rule 41b-4, found that the text of this warrant and its operation met the text of Rule 41b-4, particularly when applying the flexible interpretation of the Federal Rules of Criminal Procedure that was mandated by the Supreme Court and New York Telephone Company and has been adopted by this Court in decisions such as Coyomagian. The purpose of the NIT was to help FBI agents to locate and identify the administrators of Playpen, and that's indicated on the affidavit for the NIT warrant at paragraphs 31, 32, and 34. The NIT sees seven specific pieces of information that enabled FBI agents to track down the location of these individuals despite the fact that they were using TOR in an attempt to anonymize their IP addresses as to frustrate law enforcement tactics that would normally be used. The NIT authorized the obtaining of no other information as indicated in Affidavit paragraph 33. If the government wanted to go and actually seize evidence of child pornography from these individuals' computers or their residences, the government had to go and secure a second residential search warrant in the district where the individuals were tracked to, which is what happened in both Henderson and Hammond's cases. If you move to the text of Rule 41b-4, that rule authorizes a warrant to install within the district a tracking device, which may be used to track the movement of both person or property. Property, critically, is defined as both tangible objects and information in Rule 41a-2a. And separately, a tracking device is defined statutorily as an electronic or mechanical device that permits the tracking of the movement of a person or object. So if you apply these definitions to what the NIT actually was and how it performed, especially under a flexible interpretation of the rule mandated by Coyomajian, it's certainly reasonable to see why 18 district court decisions found that it was a tracking device. Now, what about Wardeen on the Third Circuit? Wardeen was incorrectly decided in the government's view. What Wardeen got wrong was it first held that the NIT was installed not in the Eastern District of Virginia, which would have been the requirement for a tracking device, but on the computers themselves. The NIT warrant wrote in the text of the Affidavit at paragraph 32 that it was deployed on the Playpen website, which was located in the Eastern District of Virginia. The Eighth Circuit in Horton found this definition to be plausible. It thought it stretched it a little bit too far. But Judge Fenner, one of the judges on the Eighth Circuit panel, dissented, finding that this did comply as a tracking device because it was installed within the Eastern District of Virginia. But you say it was a tracking device because, in your view, the purpose was to identify the location. Yes, Your Honor. But to identify the location, didn't you have to go into the computer and retrieve the IP address? You did, Your Honor. And our analogy in this circumstance is that this was akin to sort of attaching a beeper in the traditional sense of a tracking device in the physical space to the information itself. So what happened was is that the government uploaded the NIT to the Playpen content at the server that was residing in the Eastern District of Virginia. It augmented, is what we wrote in the NIT warrant. I'm trying to find the specific case citation for you. At Affidavit Paragraph 33, that it augmented the content that an individual went from their home in the Northern District of California in these cases, took a virtual trip to the Eastern District of Virginia, scooped up the content of the Playpen website, and attached to that content, unbeknownst to those individuals, was this NIT that would cause the transfer of information back. This sounds like a search to me. It is a search, yes, Your Honor. If we put the beeper into the can of ether not knowing that ether is the content, and it now retrieves for us what the actual content of the can is, that's a search as opposed to simply following the beeper and the movement of the can of ether. And that is why we got a search warrant, Your Honor, in this case. Okay. So the reason why we secured a search warrant is because that's what's required in order to deploy a tracking device, in order to access these individuals' computers, get this location information, just like a beeper that would be placed in a can that finds its way into someone's home and provides the information of where they're located in a private space. You're referring to the NIT search warrant. Yes, Your Honor. Was there an independent search warrant obtained with respect to either Hammond or Henderson? Yes. Once the NIT warrant divulged the location of the IP addresses, what the government did is secured an administrative subpoena from their Internet service providers to determine who the registered user of this particular IP address was. And then the government went to a magistrate in the Northern District of California with the information, linking these individuals to the IP address, linking the IP address to a particular residence, and secured residential search warrants for Mr. Hammond and Mr. Henderson's residences. When we talk about the good-faith reliance under Leon, are we talking about the search warrant issued by the magistrate in the Northern District, or are we talking about the NIT warrant? We're talking about the NIT warrant in this case. And, in fact, the defendants do not argue that the individuals who executed the search warrant at the residence somehow violated good faith or could not reasonably rely on the evidence that had been obtained as a result of the NIT warrant. But if Your Honors would like me to answer some questions about good faith, as I said, that's the most straightforward path to affirmance in this case. And, in fact, the direction that five of five courts of appeals that have already addressed this particular specific warrant have gone in, all five of those courts have held that, one, there would be no deterrent value to suppressing the evidence in this particular case, and that the agents who applied for and secured the search warrant acted in good faith. The exclusionary rule requires deliberate and culpable law enforcement misconduct, and it requires on the back end that the value of deterrence exceeds the heavy cost that the exclusionary rule creates on the justice system. The circuit courts that have addressed this NIT warrant so far said that the first as a threshold matter, the fact that the FBI agents obtained a warrant is the clearest indication of good faith, as the Supreme Court said in Messerschmidt, and that any error that was committed here was not as a result of law enforcement misconduct, but perhaps was because the magistrate judge misapprehended her territorial authority to issue the warrant. Now, reasonable minds could differ on that question. Eighteen district court opinions, as I mentioned, held that this was perfectly valid, so it would be fairly absurd to hold that the agents here somehow acted in bad faith or in deliberate misconduct when Federal judges are holding that this warrant was perfectly valid as a tracking device warrant. Sotomayor Well, suppose we disagree with you. Suppose we find or hold that the warrant was unconstitutional either because it was not a tracking device warrant or because the warrant exceeded the territorial boundary. I'm looking and thinking of the passage in Kruger written by now Justice Gorsuch which suggested that warrant was void ab initio. How can we let a warrant which is void ab initio be served even under Leon? So I think there's a couple assumptions in that question, Your Honor, and I'd like to unpack them. First, the constitutional issue was not preserved at this juncture, as we wrote in our response brief in both cases. The defendant only reserved the right to appeal three issues, alleging violations of Rule 41 and 28 U.S.C. Section 636. The defendants entered into conditional plea agreements, which this Court construes strictly under Rule 11, so those issues are waived. But even if they were not, Your Honor, a warrant void ab initio, which the Latin translation is at the beginning, none of those opinions, like in Werdin or in Horton, actually connected what they defined as an ab initio violation to the Fourth Amendment. As the Supreme Court wrote in Dahlia, and I'll get to the Justice Gorsuch point in a moment, the Supreme Court wrote in Dahlia that the Fourth Amendment requires only three things out of a search warrant, that it be issued by a neutral and detached magistrate, that it provide sufficient probable cause, and that it be sufficiently particularized. This concept that because a warrant may have been invalid because a judge exceeded its territorial authority under a rule of criminal procedure or under a statute somehow amounts to a Fourth Amendment violation doesn't actually have any support in Supreme Court law. Justice Gorsuch's minority – I'm sorry, concurrence in Kruger, which, by the way, the Tenth Circuit and Workmen did not adopt in its opinion dealing with this specific warrant. It said that Kruger dealt with materially different circumstances, relied on historical factors to argue that when a magistrate judge exceeds the territorial bounds of its authority, that that somehow amounts to a warrant that never existed at all. The government's position is that his reasoning in that concurrence is incorrect, and it actually does not have any support in Supreme Court authority on the application of the Fourth Amendment and what's required. And neither were Dean out of the Third Circuit nor Horton in the Eighth Circuit ever connect up the reasoning of, first, why this warrant would even be considered void ab initio as the defendant concedes. This warrant was valid as issued under Rule 41b-1 because the magistrate judge in the Eastern District of Virginia was authorized to deploy a search like this within the territorial boundaries of her own jurisdiction. So the idea that the warrant never existed, this legal fiction that they seek to rely on, doesn't make a whole lot of sense. But even sort of taking Your Honor's question, the next step, to the good-faith exception, it is contrary to the Supreme Court's repeated statements in cases from Leon, on through cases like Herring and Davis, that just because a warrant may be void ab initio or unconstitutional, that doesn't mean that the evidence should be suppressed.  If we believe the teachings, at least what I was taught, is that the purpose of the rule is not to punish the police, it's to deter future misconduct. Is there force to the argument that the fact that the rule has changed means there's not going to be future misconduct of this type? That's absolutely right, Your Honor. And that's exactly what several courts of appeals have held. They've looked at the fact that the Rules Committee, the Supreme Court, and its oversight capabilities of the Rules Committee and Congress, have now approved an amendment to Rule 41b, Rule 41b-6, that allows the specific investigatory technique that was approved in this case to take place under Rule 41b-6. And one of the important pillars of the good-faith exception is that the value of deterrence must exceed the heavy cost of suppression. And there would be no deterrent value to suppressing the evidence in this case, as five because this was conduct that is now sanctioned unequivocally by Federal Rule of Criminal Procedure 41b-6. So if there was an error, as the Seventh Circuit framed it in an opinion that we cite in our brief, it's regrettable, but it's unlikely to occur. Now, we maintain that this was not an error, that this was a valid tracking device, but the clarification provided by the passage of Rule 41b-6 makes that inescapable. And unless Your Honors have any further questions, we would rest on our briefs. Thank you. Scalia. Mr. Ficari? Thank you, Your Honor. A couple points. Number one, 18 district court opinions is wrong. It's 11 district court opinions. Two of the district court opinions relied on by the government have been overruled after Horton. Five of those district court opinions are from the Eastern District of Virginia where there's no Rule 41 violation. So they've got 11 district court opinions saying the NIT warrant was a tracking warrant. On the other side, there are over 80 district court opinions and two Circuit Courts of Appeal opinions saying it was not a tracking warrant. So I would ask the Court to reject the tracking warrant issue. I think as to the question about the void ab initio or the constitutionality of the warrant being waived, it was not waived, Your Honor. And I have in the record, if you look at it. Doesn't the Herring case say that even if the warrant was — it didn't exist because it was five months canceled, the good faith exception can still apply? So I mean, you can't get over that. That's a tough one. I don't dispute that. But I think that's somewhat of a separate issue. That speaks to the issue of whether a void ab initio warrant can ever be the subject of the good faith rule. But even if the Court says Herring forecloses that argument, this warrant's facially deficient, and that's the reason why the Court should apply good faith. And to speak to the idea that there's no deterrent effect, I think we have to take a step back. The government in its briefs, understandably, says, look, the rule was changed and this kind of violation will not happen again. Perhaps they're correct about the deployment of an NIT warrant that exceeds the magistrate judge's jurisdictional limitations. But if we take a step back and we look at, again, the circumstances surrounding the deployment of the NIT warrant and the fact that this warrant clearly violated Rule 41, as the overwhelming majority of courts have found, as the — in Kruger, the majority opinion in Kruger said, the obviousness of this Rule 41 defect. The issue really becomes, if we do not suppress in this scenario where there have been — the overwhelming consensus has been Rule 41 was violated and that the violation amounted to a constitutional violation, and it was a constitutional violation that had an impact in at least 150 Federal criminal cases. When you say constitutional violation, are you talking about the jurisdictional limits of 636? Correct. That the violation of the jurisdictional limits made the warrant void of an issue. So if we don't — if the court doesn't suppress in this scenario where a defective warrant authorizes 150,000 searches across the United States and abroad, then the next time the Department of Justice is confronted with a tricky technical issue, regardless of whether it is a NIT operation or some other scenario, it's going to know, well, we can get away, we can — we don't have to worry about it. The last time we did something — and I'm out of time, but I just finished my point — the last time we did something kind of dicey, we didn't get any suppression, and that's what the real issue about deterrence is. This is actually the quintessential example of deterrence, because we're talking about a systemic violation of the Rule. Thank you, Your Honor. Thank you, Mr. Vercury. Thank you, Mr. Satty. Thank you both for a very good argument. And the matter of Hammond and Henderson v. U.S. is submitted, and we will be in recess until 9 o'clock tomorrow morning.
judges: O'scannlain, Bea, Stearns